IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ISABEL IRENE VARELA,<br><br>                    Petitioner,<br><br>         vs.<br><br>JOHNSON, Warden, Central California Women's Facility,<br><br>                    Respondent. | No. 2:13-cv-00013-JKS<br><br>MEMORANDUM DECISION |

Isabel Irene Varela, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Varela is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Central California Women's Facility.  Respondent has answered, and Varela has replied.  This Court recently denied the petition for habeas relief filed by Varela's co-defendant, Jonathan Cardenas, in *Cardenas v. Grounds*, No. 2:12-cv-01333-JKS.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On December 24, 2007, Varela was charged with murder in connection with the March 10, 2007, killing of Gerardo Castillo Ramirez outside an apartment complex on Dana Drive.  The information charged that the crime committed was one in which a principal personally and intentionally discharged a firearm and that the crime was committed for the benefit of a criminal street gang.  On May 14, 2008, Varela proceeded to jury trial with her co-defendants Jonathan Cardenas and Jesus Vasquez Trujillo.

On the evening in question, Castillo Ramirez and his two friends, Rolando Rodriguez and Daniel Ponce, had been drinking at a bar, Mexico Lindo, where they met Varela.  The three men

and Varela went by taxi from the bar to Dana Drive.  According to the prosecution, Varela lured the three men to the apartment complex by telling them she would "party" with them there when she knew that Trujillo and Cardenas were waiting for them at the apartment complex and intended to rob the three men.  Trujillo was armed with the murder weapon.  When Varela and the three men arrived at the complex, she led the unsuspecting men into the courtyard where Trujillo and Cardenas attacked.

The prosecutor suggested that Cardenas struck Rodriguez on the head with a pry bar which was found at the scene.  Rodriguez was hospitalized with a gash to the head that was consistent with a blow from such a weapon.  After a struggle, Trujillo shot Castillo Ramirez as he attempted to flee.

Varela and Cardenas admitted in their testimony that they were present at the shooting. Varela said she accompanied the men to the complex unwillingly, forced by Trujillo to do so. The prosecutor did not dispute that Trujillo directed Varela but maintained that she had ample opportunity to cease participating if she had wanted to do so.

Cardenas pleaded self-defense and defense of others.  He said he was expecting that Varela would bring only one person rather than three and that Trujillo would then buy methamphetamine from that person.  According to Cardenas, Castillo Ramirez and Ponce were the aggressors, attacking Trujillo when he entered the courtyard.  As Rodriguez moved to join the fight, Cardenas hit him on the head from behind.  Cardenas denied that he used anything other than his fists.  He testified that Trujillo ran to the street in an attempt to flee; that Castillo Ramirez caught him and continued to assault him; and that the gun was discharged in the

ensuing struggle.  Cardenas said that he remained behind in the courtyard at the time of the shooting and ran out the back onto a bike trail afterward.

According to the prosecutor, the defendants were all members of the Norteno gang and were seeking to victimize the men because they were members of the Surenos, a rival gang.  The prosecutor argued that Mexico Lindo was a Sureno bar.  Cardenas testified that Rodriguez shouted a Sureno gang cry before his companions supposedly attacked Trujillo.  Cardenas therefore suggested that it was Rodriguez and his companions, not the defendants, who came to the scene intending to commit assault and robbery under the pretense of doing a drug deal.  Although Rodriguez himself denied it, it was undisputed among the parties that Rodriguez had a small amount of drugs with him that night and that a nurse at the hospital disposed of them at his request.

At the time of the killing, three homeless persons were encamped in a carport across the street from the apartment complex.  Two of them testified for the prosecution, and both supported the prosecution's version of the killing.  Although they were unable to identify the shooter, they made clear that he was the aggressor and was not defending himself as Cardenas claimed.

Shortly after the crime, the police stopped a car as it reached Cardenas's home.  Steve Young was the driver and Cardenas and Varela were passengers.  All three were arrested.  All testified that Young picked up Varela and Trujillo from the crime scene, dropped them off temporarily at the home of Young's girlfriend, returned to the crime scene to get Cardenas, picked up Varela and Trujillo again at the girlfriend's home, dropped off Trujillo at his sister's apartment, and eventually drove to Cardenas's home.

Cell phone records showed repeated contacts among Young, Trujillo, Cardenas, and Varela before and after the shooting.  Young testified for the prosecution as part of a plea bargain after he was originally charged with murder and conspiracy.  In return for a promise to testify truthfully, he pled guilty to being an accessory after the fact, with no prison sentence.

After the conclusion of trial, the jury convicted Varela, Cardenas, and Trujillo of first degree murder and found the additional allegations true.  On July 18 2008, Varela was sentenced to a total term of 50 years to life: 25 years to life for the murder, a consecutive term of 25 year to life for the gun use enhancement.  The court stayed a sentence for the gang enhancement.  The court also ordered Varela to pay $79,030.01 in restitution, reserved determination of future expenses, imposed a restitution fine of $10,000, and suspended a parole revocation restitution fine of $10,000.

Through counsel, Varela appealed her conviction.  She argued that: 1) the verdict on the gang enhancement should be reversed because the enhancements were not supported by legally sufficient evidence and the trial court erred in barring cross-examination of and failing to strike the testimony of an expert witness; 2) the trial court erred in denying Varela's request for a pinpoint instruction on a duress defense; 3) the prosecutor committed misconduct by misstating the law of duress in his closing argument; 4) her sentence constituted cruel and unusual punishment; and 5) the cumulative effect of the errors warranted reversal of her conviction.  She additionally joined the arguments of Cardenas and Trujillo.  On March 11, 2011, the California Court of Appeal affirmed Varela's conviction in a reasoned opinion.  Varela petitioned for review of the denial to the California Supreme Court, which summarily denied review.

Varela then filed a *pro se* petition for a writ of habeas corpus to the California Supreme Court.  In her habeas petition, Varela argued that the prosecutor committed misconduct by concealing the fact that the prosecutor's forensic pathologist witness was not qualified as an expert witness and by knowingly using the perjured testimony of Young.  She also argued that her trial counsel was ineffective for failing to evaluate her for and present evidence on intimate partner battering and for failing to disclose to her a plea offer made by the prosecution.  She additionally contended that the trial court erroneously applied the California Penal Code § 12022.53(e)(1) enhancement which resulted in a cruel and unusual punishment.  Finally, she claimed that she was denied her right to a fair and impartial jury when the trial court denied her motion for a mistrial based on a biased juror.  The Supreme Court denied the petition without comment on October 24, 2012.

Varela timely filed a Petition for a Writ of Habeas Corpus to this Court on December 19, 2012.

## II. GROUNDS/CLAIMS

In her *pro se* Petition, Varela raises the following claims: 1) the prosecutor committed misconduct by concealing the fact that the prosecutor's forensic pathologist witness was not qualified as an expert witness and by knowingly using the perjured testimony of Young; 2) her trial counsel was ineffective for failing to evaluate her for and present evidence on intimate partner battering and for failing to disclose to her a plea offer made by the prosecution; 3) she was "over sentenced due to erroneous application" of Penal Code § 12022.53(e)(1); 4) she was denied her right to a fair and impartial jury when the trial court denied her motion for a mistrial based on a biased juror; 5) the court erred in denying her request for a pinpoint duress instruction; 6) the prosecutor committed misconduct in closing by "misstating the law of

duress";  7) her 50-years-to-life sentence is cruel and unusual punishment; 8) the cumulative

impact of the error warrants reversal of her conviction; and 9) the verdict on the gang

enhancement is erroneous.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

In this regard, a federal habeas court "may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly.  Rather, that application must also be

unreasonable."  *Id.* at 412; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer v.

Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent

review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous'"

(citation and internal quotation marks omitted)).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Williams*, 529 U.S. at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that a petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v.*

*Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court reaches a

decision on the merits but provides no reasoning to support its conclusion, a federal habeas court

independently reviews the record to determine whether habeas corpus relief is available under

§ 2254(d).  *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011); *Himes v. Thompson*, 336 F.3d

848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent

state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.  Where no reasoned

decision is available, the habeas petitioner still has the burden of "showing there was no

reasonable basis for the state court to deny relief."  *Harrington v. Richter*, 131 S. Ct. 770, 784

(2011).

IV. DISCUSSION

1.     *Prosecutorial Misconduct* (claims 1 and 6)

Varela brings two claims alleging prosecutorial misconduct.  In claim 1, she makes three

separate arguments: 1) the prosecutor "concealed the fact that the prosecutor's witness, Dr. Gill,

was not qualified as an expert witness"; 2) the prosecutor "knowingly used perjured testimony of

a multi-convicted felon"; and 3) the prosecutor "intentionally chose to make non-foundational

statements to the jury . . . in the absen[c]e of evidence and true facts."  None of these arguments

are meritorious.

With respect to the first argument, Varela's counsel unsuccessfully argued at the

preliminary hearing that the prosecution was required under *Brady v. Maryland*, 373 U.S. 83

(1963), to disclose evidence of prior criminal convictions and other alleged misconduct relating

to the prosecution's autopsy expert.  Varela appears to argue in her Petition that, because the

8

prosecution was not required to and thus did not disclose such evidence, the prosecutor committed misconduct.  But as the trial court noted, the scope of Dr. Gill's testimony in this case was "very limited" and "does not appear to be an issue in dispute at the trial."  Indeed, the record does not indicate that Dr. Gill's toxicology findings were disputed at trial, and Varela fails to demonstrate that the disclosure of the alleged prior convictions and other misconduct would have led to a different outcome in her case.  The Court therefore must reject this argument.

As to her second argument, although the prosecutor has a duty to refrain from knowingly presenting perjured testimony, *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002), the record does not support Varela's contention that the prosecution knowingly introduced the perjured testimony of Young.  The conflicting version of events the prosecution presented through Young's testimony, at most, created issues of fact and credibility for the jury to resolve. *Cf. id*. (distinguishing prosecutorial misconduct in presenting perjured testimony from the presentation of evidence that included conflicting versions of criminal events).  Moreover, Varela had an opportunity to impeach Young on cross-examination and challenge his credibility before the jury.  These circumstances provide no basis for habeas relief on the ground of prosecutorial misconduct. *See United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) ("The fact that . . . other witnesses have conflicting recollections of events . . . does not establish that the testimony offered at trial was false.").

Her third argument also must fail.  In the prosecutor's opening statement, the prosecutor stated that the victims were not validated gang members and that "Varela may have thought they were, but they weren't."  Varela argues in her Petition that the prosecutor "offered his version of [Varela's] thoughts toward" the victims, which she claims was unsupported by evidence.  Varela

fails to establish that the prosecutor's statement was improper because it was simply argument, and the jury was instructed that "[n]othing the attorneys say is evidence." *See Boyde v. California*, 494 U.S. 370, 384-85 (1990) (arguments of counsel generally carry less weight with jury than instructions from the court; the arguments are described in advance to jury as matters of argument, not evidence). Varela cites no authority in support of her claim and this Court can find none. The Supreme Court has not established that statements of this type are improper, much less a violation of due process. This claim therefore also must be rejected.

In claim 6, Varela argues that the prosecutor also committed misconduct in his closing argument by misstating the law of duress. In considering this claim on direct appeal, the Court of Appeal recounted the following facts:

> In his rebuttal argument, the prosecutor argued that Varela's duress defense was "not supported" and "not really sufficient," explaining, "When you analyze out the so-called threats, what they mean, whether or not there was any immediacy of risk of harm with her options, what a reasonable person would have done, she doesn't get the benefit of that."
> The following exchange then took place:
> "MR. OGUL [Varela's counsel]: That misstates the law. Duress doesn't require what a reasonable person would have done.
> "THE COURT: Overruled.
> "MR. OGUL: It requires what a reasonable person would have believed was an immediate danger.
> "THE COURT: Overruled.
> "MR. WILLIAMSON [the prosecutor]: And he was right about that, so he made a point; it is correct." The prosecutor then moved on to another topic.

The appellate court rejected Varela's claim, stating, "Assuming for purposes of argument that the prosecutor's misstatement constituted misconduct, that misconduct was immediately cured by the prosecutor's acknowledgement that Varela's counsel's statement regarding what the law requires was accurate." Because the prosecutor cured the error, the appellate court found

that "[i]t is . . . not reasonably probable that Varela would have received a more favorable outcome had the prosecutor not made such a comment."

Under clearly established federal law, a prosecutor's incorrect and improper comments will be held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam) (quoting *Darden v. Wainright*, 477 U.S. 168, 181 (1986)); *see Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000). In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding. *Boyde*, 494 U.S. at 385; *Darden*, 477 U.S. at 179-182. Even when prosecutorial misconduct rises to the level of a due process violation, such misconduct provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993). *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).

In this case, the jury was instructed:

> The defendant Varela's belief that her life was in immediate danger must have been reasonable. When deciding whether her belief is reasonable, consider all the circumstances as they were known to and appeared to her, and consider whether a reasonable person in the same position as the defendant would have believed.

Varela does not contend in her Petition that the jury instruction was incorrect, and we must presume that the jury followed its instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Given that the jury was correctly instructed as to the law of duress and the prosecutor corrected his misstatement of the law, Varela cannot demonstrate that the prosecutor's remarks was harmless or rendered her trial unfair. Varela is therefore not entitled to relief on this claim.

2.      *Ineffective Assistance of Trial Counsel* (claim 2)

Varela also claims that her trial counsel was ineffective for: 1) not having her evaluated for or presenting expert testimony on intimate partner battering ("IPB"); and 2) failing to disclose to her that the prosecution made a plea offer.  These claims were raised in her state habeas petition which was summarily denied.

A.      *Strickland* Standard on Habeas Review

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Thus, Varela must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

12

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

B.      Intimate Partner Battering Defense[1]

The effects of intimate partner battering have been defined as "a series of common characteristics that appear in women [or men] who are abused physically and psychologically over an extended period of time by the dominant male [or female] figure in their lives."  *In re Walker*, 54 Cal. Rptr. 3d 411, 420 (Cal. Ct. App. 2007) (internal quotation marks and citations omitted).  California Evidence Code § 1107(a) authorizes expert testimony on "intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

---

[1]      "Intimate partner battering" was formerly referred to as "battered women's syndrome."  *See* CAL. EVID. CODE § 1107(f).

Although evidence relating to intimate partner battering is relevant to the reasonableness of the victim's actions and to her credibility, *People v. Brown*, 94 P.3d 574, 580 (Cal. 2004), Varela fails to show how she would have fared better with evidence of intimate partner battering than she did with her duress defense.  The underlying premise with both defenses is that Trujillo's abuse and threats made her fear for her life and forced her to take part in the offense.  Indeed, the Ninth Circuit has recognized that "[t]he battered woman defense is a species of the defense of duress."  *United States v. Homick*, 964 F.2d 899, 905 (9th Cir. 1992).  While there is a slight variance in the jury instructions relating to the reasonableness determination in each defense,[2] Varela does not prove that the jury would have found her credible or her actions reasonable under the intimate partner battering instruction.

Morever, she provides no support for any contention that she would have been diagnosed with intimate partner battering and provides nothing other than her own statements that such defense would have been successful.  This lack of evidentiary support is fatal to her claim.  *See Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (petitioner's own self-serving statements insufficient to support claim of ineffective assistance of counsel without corroborating evidence); *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (mere speculation that evidence might be helpful insufficient to establish ineffective assistance); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting claim of ineffective assistance for failure

---

[2]     Both instructions require the juror, in deciding whether the defendant's belief that she was in immediate danger of death was reasonable, to consider the circumstances as they were known to and appeared to the defendant.  CALCRIM 851; CALCRIM 3402.  The duress instruction also asks the juror to "consider what a reasonable person in the same position as the defendant would have believed."  CALCRIM 3402.  The intimate partner battering instruction, on the other hand, requires the juror to "consider what conduct would appear to be necessary to a reasonable person in a similar situation with similar knowledge."  CALCRIM 851.

to call witness based upon lack of affidavit from witness regarding substance of testimony).

Accordingly, Varela cannot prevail on this ineffective assistance claim.

C.      Plea Offer

"[C]riminal defendants require effective counsel during plea negotiations" because

"[a]nything less . . . might deny a defendant effective representation by counsel at the only stage

when legal aid and advice would help him." *Missouri v. Frye*, 132 S. Ct. 1399, 1407-08 (2012)

(internal quotation marks and citations omitted).  Consequently, defense counsel must

communicate the prosecution's formal offers "to accept a plea on terms and conditions that may

be favorable to the accused." *Id.* at 1408.  If defense counsel allows the offer to expire "without

advising the defendant or allowing him to consider it," defense counsel fails to render the

effective assistance required by the Constitution.  *Id.*; *United States v. Rivera-Sanchez*, 222 F.3d

1057, 1060-61 (9th Cir. 2000).

In her Petition, Varela claims:

> A plea offer of 16 years was made by the prosecution, which was turned down by
> counsel.  [Varela] was unaware of this offer at the time it was made.  [Varela's]
> awareness came about when she asked counsel if a deal was offered.  He stated, "Well, I
> came across the D.A. (Mr. Williamson) in the office and asked him for a plea deal, and
> he (Mr. Williamson) said 16 years to testify.  I said, 'No, that's no deal.'"  Counsel failed
> to inform and present this offer to [Varela] for her to decide if she would like to take it.

As an initial matter, the record does not indicate that the prosecution offered a plea deal

to Varela's counsel which counsel was then required to convey to Varela.  Varela provides no

other support for her assertion that a plea offer was in fact made by the prosecution, and

Respondent does not concede that such a plea was made.

Varela raised this claim in her state habeas petition to the California Supreme Court with

the same bare assertions and lack of evidentiary support that she provides to this Court.  The

state court summarily denied the petition (and thus this claim) without conducting an evidentiary

hearing.  She did not raise this claim to the state courts in any other proceeding and thus did not

develop the factual basis of her claim before the state courts.

Varela fails to show that the state court's denial of her claim was an unreasonable

application of Supreme Court authority.  Varela did not contend in her state habeas

petition—and indeed does not contend in her Petition before this Court—that, had she been

informed of the alleged plea offer, she would have accepted it.  The state supreme court could

reasonably have determined that the lack of such contention rendered her claim without merit.

*See People v. Boateng*, Nos. B149120, B152691, 2002 WL 560990, at *13 (Cal. Ct. App. Apr.

16, 2002) (rejecting without holding an evidentiary hearing defendant's claim that counsel failed

to inform him of a purported plea offer where defendant failed to state that if such offer had been

communicated to him, he would have accepted it).  Such deficiency would also be fatal to her

claim under Supreme Court authority.  *See Lafler*, 132 S. Ct. at 1386 (the petitioner must show

"that but for the ineffective advice of counsel there is a reasonable probability . . . that the

defendant would have accepted the plea").

Because the state court denied Varela's claim without holding an evidentiary hearing,

this Court may liberally construe Varela's claim as a challenge to the fact-finding process itself.

*See Taylor v. Maddox*, 366 F.3d 992, 999, 1001 (9th Cir. 2004).  The Ninth Circuit has held in

"some limited circumstances . . . that the state court's failure to hold an evidentiary hearing may

render its fact-finding process unreasonable under § 2254(d)(2)."  *Hibbler v. Benedetti*, 693 F.3d

1140, 1147 (9th Cir. 2012); *Taylor*, 366 F.3d at 1001.  However, the Ninth Circuit "ha[s] never

held that a state court must conduct an evidentiary hearing to resolve every disputed factual

16

question; such a per se rule would be counter not only to the deference owed to state courts under AEDPA, but to Supreme Court precedent." *Pizzuto v. Blades*, 729 F.3d 1211, 1219 (9th Cir. 2013) (quoting *Hibbler*, 693 F.3d at 1147).

In determining whether the state court's failure to hold an evidentiary hearing rendered its fact-finding process unreasonable, the Ninth Circuit has instructed that courts may turn for guidance to cases considering when a federal district court on habeas review must conduct an evidentiary hearing. *Hibbler*, 693 F.3d at 1147. In this case, Varela's mere statement that an offer was made and rejected is insufficient to trigger the need for an evidentiary hearing before this Court and thus fails to establish that the state court's fact-finding process was unreasonable. *See Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001) (unsupported, conclusory allegations are not enough to warrant an evidentiary hearing); *see also Saunders v. United States*, 278 F. App'x 976, 979 (11th Cir. 2008) (per curiam) (a petitioner who alleges ineffective assistance of counsel based on counsel's failure to inform him of a plea offer but fails to disclose the details of that offer is not entitled to an evidentiary hearing). Accordingly, Varela is not entitled to habeas relief or an evidentiary hearing on this ineffective assistance of counsel claim.

3.      *Sentencing Error* (claim 3)

Varela next claims that she was "over sentenced" due to the court's erroneous application of the firearm enhancement of California Penal Code § 12022.53(e)(1) which applies to principals in a gang-related crime where a principal used a gun. Varela raised this claim in her state habeas petition, which was summarily denied.

The thrust of Varela's claim is that the enhancement should not have been imposed upon her because she was convicted not as a principal but as an aider or abettor. As an initial matter,

Varela appears to be mistaken.  California Penal Code § 12022.53(e)(1), provides, "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d) [use of firearm]."  Section 31 defines "principals" as "[a]ll persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . ."  CAL. PENAL CODE § 31.

More importantly, however, Varela's claim presents only a state law sentencing error that is not cognizable on federal habeas review.  *See Souch v. Schiavo*, 289 F.3d 616, 623 (9th Cir. 2002) (claim challenging state court's discretionary decision concerning application of state sentencing law presented only state law issues and thus was not cognizable in a proceeding pursuant to 28 U.S.C. § 2254); *see also Swarthout*, 131 S. Ct. at 863; *Estelle*, 502 U.S. at 67-68. Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[3]  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas

---

[3]        At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error. *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard. *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA. *Lockyer*, 538 U.S. at 75-76 (clear error standard is insufficiently deferential to state courts).

proceeding it is not. *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (quoting § 2254(d)(1))).

Even assuming that Varela is correct that the trial court misapplied California law when imposing the enhancement, absent a showing of fundamental unfairness, a state court's misapplication of its own sentencing law does not warrant habeas relief. *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994); *see also Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (declining to examine state court's determination that habeas petitioner's prior conviction was for a "serious felony" under state sentencing regime). Federal courts are "bound by a state court's construction of its own penal statutes," *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993), and this Court therefore must defer to the California courts' application of the state's three strikes law unless that interpretation is "untenable or amounts to a subterfuge to avoid federal habeas review of a constitutional violation." *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir. 1989). Varela does not allege that the state court's imposition of the firearm enhancement was either untenable or done to avoid federal review of her sentence.

Nor has Varela shown that the imposition of the firearm enhancement was arbitrary, capricious, or fundamentally unfair in violation of federal due process. *See Christian*, 41 F.3d at 469; *see also People v. Gonzalez*, 104 Cal. Rptr. 2d 247, 256 (Cal. Ct. App. 2001) (rejecting a due process challenge to § 12022.53(3) because "the only requirement is that the aider and abettor intend to facilitate the target offense and that the offense ultimately committed is the

natural and probable consequence of the target offense").  Accordingly, Varela is not entitled to relief on this claim.

4.    *Biased Juror* (claim 4)

Varela additionally argues that the trial court erred in denying the defendants' motion for a mistrial based on a juror who expressed "prejudgement of guilt and fear for his life."  She claims that the juror showed bias and prejudice by clear and convincing evidence and thus his participation on the jury violated Varela's rights to due process and a fair trial.

In considering this claim on direct appeal, the Court of Appeal laid out the following facts:

> At the start of proceedings on Wednesday, May 21, 2008, after the jury had been sworn but before alternates had been selected, the court called in juror number eight, A.P., whom the court understood to have "an issue."  A.P. said that the previous Friday, he thought he remembered Trujillo's attorney saying that his client was "charged because he's the one who pulled the trigger."  When Trujillo's attorney denied saying anything like that, A.P. said, "maybe I misheard him, and then I am of the opinion this weekend that if he was the one that pulled the trigger, then he might be guilty.  [¶]  Also, my next concern is that because it's a gun-related case, I'm . . . concerned about the safety of my family, and that's all, your Honor."
>
> After reminding A.P. that he was under oath, the court questioned him as follows:  "THE COURT: Are you telling this Court and these parties that you have formed an opinion already as to the guilt of one of these people based on what they're charged with?
>
> "THE PROSPECTIVE JUROR: Um, maybe because, Your Honor, that if—if I heard it right Friday, that one of the defendants was the triggerman, maybe, maybe I misheard it.  That's why I formed the opinion."
>
> After reminding A.P. that he had said during voir dire that he could follow the law relating to evidence of guilt, A.P. again said he had formed the opinion after mishearing the lawyer.  The following exchange then took place between the court and A.P.:  "THE COURT: When you put [that opinion] aside, are you going to sit as a fair juror in this case?
>
> "THE PROSPECTIVE JUROR: I'll try my best, Your Honor, because I guess I misheard the lawyer about it.
>
> "Well, my second concern, Your Honor, is that because it's a gun-related [sic], I'm concerned about the safety of my family.  That's my next concern."

When the court asked if anyone had threatened A.P., he responded, "Well, I just have a feeling right now, Your Honor.  [¶] . . . [¶]  That maybe, you know, if because it's a gang-related case, you know I have this wild imagination that maybe in the afternoon, someone would follow me to my house and everything, you know, something like that."

Trujillo's attorney then questioned A.P., first asking if he could have gotten the impression that Trujillo was the "triggerman" from the clerk reading the information in which Trujillo was described as someone who used a firearm in the commission of the offense.  A.P. said he was not sure, and the following exchange took place between counsel and A.P.:

"MR. COFFER [Trujillo's counsel]: But it is a fact that after you heard this Information [sic] from whatever source you received it, you began to think about that fact, the fact that a gun was allegedly used and that my client used it; is that correct?

"THE PROSPECTIVE JUROR: Yes.

"MR. COFFER: And you've been thinking about that fairly continuously or continually over the weekend; is that true?

"THE PROSPECTIVE JUROR: Yes.

"MR. COFFER: And now you come in here and its been, um, weighed on your mind to such an extent that you now believe you cannot be a fair juror and that's why you've asked to see the Judge?

"THE PROSPECTIVE JUROR: Yes.

"MR. COFFER: Do you really think you can give my client a fair trial now that you had to think about it in the way you described [sic]?

"THE PROSPECTIVE JUROR: Well, not that if now that I think I misheard the statement, then I'll probably do my job; still in the back of my mind, but I'll try my best.

"MR. COFFER: Well, you'll try your best.  Previously, you had sworn that you would be able to give my client a fair trial.  Now you have some doubts about that; is that what you are saying?

"THE PROSPECTIVE JUROR: Um, a little bit, you know, I-I have to be-I have to tell the truth, maybe a little bit, yes."

Trujillo's counsel told the court that he was challenging A.P.: "Well, [A.P.] hasn't a solitary fact in this case.  He already told us he's somewhat prejudiced against my client at this point."  Then, outside the presence of A.P., counsel said he was moving for a mistrial, explaining: "It appears to me quite clear that [A.P.] has formed an opinion about my client in particular.  It's not just an opinion; that would be bad enough, but it's an opinion that's accompanied with a level of fear of my client, that apparently, at least as I interpret [A.P.'s] comments, that my client might hunt him down or trail him or track him to his home and harm him or his family.

"So [A.P.] is not only concerned about himself in relation to my client, but he's also concerned about his family in relation to my client.  He knows . . . that this is a gang-related case, and even if Mr. Trujillo could not give him harm, he might well fear that his gang friends might . . . come to his home and harm him.

"These are thoughts he's been having, he tells us, throughout the weekend, since Friday, and I don't know how we can rehabilitate [A.P.] at this point to make him a fair juror, to have the kind of open mind we want, the kind of impartiality that we have in a case as serious as this, so I am asking for a mistrial."

Both Cardenas's and Varela's attorneys joined in the motion for a mistrial. The prosecutor said he opposed the motion for a mistrial. The trial court then denied the purported challenge for cause and the motion for a mistrial.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). While "[d]oubts regarding bias must be resolved against the juror," *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004), a defendant "bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause," *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks and alteration omitted). "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

However, Varela fails to demonstrate the existence of juror bias. As the Court of Appeal recognized when it denied this claim on direct appeal, on balance, the juror's responses did not demonstrate bias. "Although he never gave a guarantee that he would be unbiased, once his misapprehension was corrected and despite his safety concerns, [the juror's] responses to the court and counsel's questions reflect that he intended to do his best to give [the defendants] a fair trial." Even if his responses were somewhat uncertain, his responses as a whole showed a willingness to set aside his personal views and decide the case based on the evidence.

Moreover, a trial judge's finding that a juror was not biased is a factual finding presumed to be correct because "resolution [of the juror impartiality issue] depends heavily on the trial court's appraisal of witness credibility and demeanor." *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *see, e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). This presumption of correctness also applies to implicit factual findings. *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990). Here, Varela's bare assertion that the juror was biased does not meet his burden of adducing clear and convincing evidence sufficient to overcome the presumption of correctness afforded the trial court's finding of impartiality. *See* 28 U.S.C. § 2254(e)(1). Accordingly, the state court's rejection of Varela's juror bias claim did not contravene or unreasonably apply federal law, and Varela cannot prevail on this claim.

5.      *Instructional Error* (claim 5)

Varela likewise claims that "the court erred in denying the request for a pinpoint instruction on prior threats and violence as they related to the defense of duress."

In considering this claim on direct appeal, the Court of Appeal recounted the following facts:

> Varela's counsel requested that, in addition to the standard instruction on duress (CALCRIM No. 3402), the court give the jury an instruction relating prior threats and acts of violence on Varela by Trujillo and other gang members to Varela's fear of Trujillo. Varela's counsel proposed an instruction modeled on language from CALCRIM No. 505, a self-defense instruction.[FN37] According to Varela's counsel, the evidence that supported the giving of this instruction included Varela's testimony that Trujillo had sexually assaulted her and that other gang members associated with Trujillo had threatened her and hit her with a gun to punish her for supposedly losing a gun that belonged to the gang.

> > FN37. CALCRIM No. 505 provides in relevant part: "[If you find that < *insert name of decedent/victim* > threatened or harmed the defendant [or others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]

23

"[If you find that the defendant knew that < *insert name of decedent/victim* > had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]

"[Someone who has been threatened or harmed by a person in the past, is justified in acting more quickly or taking greater self-defense measures against that person.]

"[If you find that the defendant received a threat from someone else that (he/she) reasonably associated with < *insert name of decedent/victim* >, you may consider that threat in deciding whether the defendant was justified in acting in (self-defense/ [or] defense of another).]"

The prosecutor argued that such an instruction applied only to self-defense and should not be given in a case in which the defense was duress. The trial court ruled: "I'm not giving that. Deny that instruction. It goes to self-defense . . . ."

The trial court ultimately instructed the jury on duress, pursuant to CALCRIM No. 3402, as follows: "The defendant Isabel Varela is not guilty of aiding and abetting an attempted robbery resulting in felony murder charged in Count 1 if she acted under duress. The defendant Isabel Varela acted under duress if, because of a threat or menace, she believed that her life would be in immediate danger if she refused a demand or request to commit the crime.

"The demand or request may have been express or implied. The defendant Varela's belief that her life was in immediate danger must have been reasonable. When deciding whether her belief is reasonable, consider all the circumstances as they were known to and appeared to her, and consider whether [sic] a reasonable person in the same position as the defendant would have believed.

"A threat of future harm is not sufficient. The danger to life must have been immediate.

"The People must prove beyond a reasonable doubt that the defendant Varela did not act under duress. If the People have not met the burden, you must find her not guilty."[FN38]

FN38. As the instruction makes clear, the duress defense went to Varela's guilt in aiding and abetting an attempted robbery for purposes of the felony murder charge, and not the murder itself, for which a duress defense is not available. (See *People v. Anderson* (2002) 28 Cal.4th 767, 780.)

California law mandates that, under appropriate circumstances, "a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case." *People v. Bolden*, 58 P.3d 931, 958 (Cal. 2002). The Court of Appeal nonetheless determined here that the trial court did not err in refusing to give the pinpoint instruction Varela requested:

24

In the present case, the standard duress instruction informed the jury that Varela acted under duress if, "*because of a threat or menace*, she believed her life would be in immediate danger if she refused a demand or request to commit the crime," and further stated that, when deciding whether her belief was reasonable, the jury must, inter alia, "*consider all the circumstances as they were known to and appeared to her . . . .*" (CALCRIM No. 3402, italics added.)

Contrary to Varela's assertion, this instruction neither forced the jury to consider only present threats nor precluded it from considering past threats or assaults, to the extent they affected her current belief that she was in immediate danger. Instead, the instruction told the jury to consider "all circumstances" known to Varela in deciding the reasonableness of her belief. In light of this language, past threats and assaults by Trujillo and other gang members associated with Trujillo plainly were evidence the jury could consider in reaching its conclusion.

Varela nonetheless points out that, in the self-defense context, upon defense request and when supported by sufficient evidence, the trial court must instruct the jury that it may consider the effect of "antecedent threats and assaults against the defendant on the reasonableness of defendant's conduct." However, even assuming that the failure to adapt the requested portion of CALCRIM No. 505 to the distinct defense of duress was error, it is not reasonably probable that, had the court given the requested pinpoint instruction, the result would have been different.

First, Varela's counsel "thoroughly aired" the subject of the prior threats and assault in closing argument. While discussing Varela's belief that she was in immediate danger, counsel described the evidence regarding prior threats and assaults, as well as the evidence of contemporaneous threats. Second, . . . "The concept at issue here [of prior assault and threats and the reasonableness of Varela's belief in her immediate danger] is closer to rough and ready common sense than abstract legal principle. It is also fully consistent with the otherwise complete [duress] instructions given by the court. It is unlikely the jury hearing the evidence, the instructions given and the argument of counsel would have failed to give [Varela's] position full consideration."

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution

and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* at 73.  Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72.

Varela fails to demonstrate that she was denied a fair trial.  In making that determination, "[t]he jury instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72.  Based on the Court's review of the instructions as a whole and the lawyers' closing arguments on the issue of duress and prior threats, this Court agrees with the appellate court that there is no basis to conclude that there was any defect with the jury instruction here.

Varela contends that "the duress instruction given to the jury effectively foreclosed the jurors from considering the prior threats."  But the record proves otherwise.  In closing argument, Varela's counsel argued that Varela believed she was in "immediate danger," was threatened at the meeting at Fairlas records, was raped and abused by Trujillo, and was a victim of gang culture in which women were routinely used or abused.  The prosecutor did not object or argue that the threats or assaults were irrelevant; rather, in rebuttal he expressed doubt that her actions suggested she had been threatened and argued that the threats were uncorroborated.  The record therefore demonstrates that Varela used the evidence of prior threats and assaults to

support her claim that her fear of imminent death led to her actions.  That the jury did not find

Varela's duress defense credible does not prove that the jurors did not consider evidence of prior

threats.  Varela therefore cannot prevail on her instructional error claim.

6.      *Cruel and Unusual Punishment* (claim 7)

        Varela also contends that her sentence of 50 years to life "is grossly disproportionate to

[her] culpability and violates the [state and federal] provisions against cruel and unusual

punishment."

        The Court of Appeal also rejected this claim on direct appeal after applying a "three-

pronged approach" under California state law to determine whether Varela's sentence is grossly

disproportionate to the crime committed.

        The Eighth Amendment, applicable to the States through the Fourteenth Amendment,

proscribes the infliction of "cruel and unusual punishments."  U.S. CONST. amend. VIII; *Kennedy

v. Louisiana*, 554 U.S. 407, 419 (2008).  In determining whether to infer gross

disproportionality, a federal court should examine whether a petitioner's sentence is justified by

the gravity of his triggering offense and his criminal history, a process similar to the three-

pronged approach employed by California state courts.  *See Ramirez v. Castro*, 365 F.3d 755,

768 (9th Cir. 2004).  Where the crime is murder, even a life sentence without parole is not

grossly disproportionate.  *See Harris v. Wright*, 93 F.3d 581, 584-85 (9th Cir. 1996) (life

imprisonment without possibility of parole for aggravated first-degree murder raises no inference

of gross disproportionality); *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) ("Under

*Harmelin* [*v. Michigan*, 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for

murder does not constitute cruel and unusual punishment.").  Furthermore, while the contours of

the "gross disproportionality principle" have been called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case. *Lockyer*, 538 U.S. at 72-73; *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

Varela cannot demonstrate that this is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime and relevant criminal history.  The Court of Appeal reasonably rejected her contention that the sentence is excessive in light of her claims that "she was in no position to refuse to follow the orders given to her by Trujillo," she was unarmed and did not join in the attack on the victims, her previous criminal record was "minimal," and she "was not a hardcore gang member." Indeed, the Supreme Court, referencing *Enmund v. Florida*, 458 U.S. 782 (1982)—a case in which a defendant was convicted of first degree felony murder for aiding and abetting a robbery in the course of which a murder was committed even though he did not participate in the actual killing and had no intent to kill—has stated that "no sentence of imprisonment would be disproportionate for [first degree felony murder]." *Solem v. Helm*, 463 U.S. 277, 290 n.15 (1983).

Varela additionally argues that:

> [She] was convicted of first degree murder with the use of a firearm.  In the abstract, the punishment she received is not disproportionate to other sentences imposed for these crimes in California.  The argument here is not that the punishment is excessive as a general matter, but rather that it is cruel and unusual under the particular circumstances of this case.

The essence of this argument is that she was wrongly convicted of the firearm enhancement.  But as discussed in claim 3, *supra*, that argument is without merit and not

cognizable on habeas review.  Moreover, as the Court of Appeal noted, the firearm enhancement does not constitute cruel and unusual punishment because "[t]he underlying purpose of section 12033.53—to protect innocent people and deter violent crime—is plainly applicable to the offense committed by Varela."

Varela further argues that the 25-years-to-life imprisonment term attached to the firearm enhancement is excessive when compared to the punishments doled out by other states for firearm use.  In support of her argument, she lists out the statutory provisions for gun use enhancements in the other states.  But as the California Court of Appeal has concluded when considering a nearly identical argument:

> [A] straight comparison of the number of years imposed by California for firearm use and that imposed by other states is like comparing apples and oranges.  California employs a graduated scheme of punishment based upon the extent of the gun use in the commission of the crime; punishment of 10 years for using a gun, 20 years for discharging it and 25 years to life for discharging it and causing death or great bodily injury.  (§ 12022.53, subds. (b), (c) & (d), respectively.)  Some other states with lower sentences impose the lower sentence regardless of the extent of the gun use and do not appear to have a graduated gun-use penalty.  (i.e., Okla. Stat., Ch. 21, § 1287 [punishes possession of gun during commission of a felony]; Vt. Stat., Tit. 13, § 4005 [punishes carrying deadly or dangerous weapon].)
>
> Oklahoma is illustrative of how the many different variables in assessing the severity of a punishment make comparison difficult.  Oklahoma makes "possession" of a gun during the commission of a felony a separate felony from the underlying offense, subject to a penalty of two to 10 years for the first gun possession offense and 10 to 30 years for any subsequent gun possession offenses.  (Okla.Stat., Ch. 21, § 1287.)  The punishment appears to be the same whether the gun is carried, discharged or discharged and kills or seriously injures someone.  Its two to 10-year sentence for mere possession is comparable to California's 10-year sentence for using a gun without discharging it.  Further, its 10-to-30-year sentence for subsequent convictions of possessing a gun during a felony is potentially greater than California's 25-years-to-life penalty for discharging a gun and killing someone.  Nebraska, on the other hand, provides that the use of a firearm to commit any felony is an additional offense punishable between one and 50 years in prison (Neb.Stats. §§ 28-1205(1) & 28-1205(2)(b)), a potentially longer sentence than imposed under section 12022.53, subdivision (d).

*People v. Baker*, No. B198036, 2008 WL 3916301, at *10 (Cal. Ct. App. July 23, 2008).

In short, the Court of Appeal's finding that the trial court's sentence was not grossly disproportionate to the crime for which Varela was convicted in light of the circumstances of the instant offense was not contrary to, or an objectively unreasonable application of, any clearly established federal law and was not based upon an unreasonable determination of the facts in light of the evidence presented.  Accordingly, Varela is not entitled to habeas relief on her Eighth Amendment claim.

7.      *Gang Enhancement Verdict Errors* (claim 9)

Varela raises four claims of error with regard to the jury's gang enhancement verdict:

> (1) The court abused its discretion curtailing cross-examination of [gang expert] Detective McCoy and violated Ms. Varela's right to confront the witnesses against her under the Sixth and Fourteenth Amendments.  (2) The court erred in refusing to strike McCoy's testimony.  (3) The evidence is insufficient to establish that . . . Ms. Varela committed the crime "for the benefit of, at the direction of, or in association with" a criminal street gang.  (4) The evidence is insufficient to establish that Ms. Varela acted with "the specific intent to promote, further, or assist in any criminal conduct by gang members."

A.      Gang Expert Testimony

Under California law, expert testimony on criminal street gangs is admissible to prove the elements of the criminal street gang substantive offense and the gang enhancement.  *See People v. Jasso*, 150 Cal. Rptr. 3d 464, 484 (Cal. Ct. App. 2012) (relying on expert testimony in part to support a conviction for the substantive offense); *see also People v. Hernandez*, 94 P.3d 1080, 1085 (Cal. 2004) ("In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs.").  Varela nonetheless argues that the admission of the gang expert's testimony that the crimes had been planned at a gang meeting was error because the court did not permit cross-examination about

30

the basis of the opinion in violation of his confrontation rights and erred in refusing to strike

McCoy's testimony on that basis.

When asked why he believed that the offense was committed "at the direction of, for the

benefit of, or in association with the criminal street gang known as the Nortenos," Detective

McCoy answered:

> Being familiar with the case, and the way the Norteno, Northern Structure,
> Nuestra Familia conducts business, I believe my understanding is that there was a
> meeting that took place prior to this incident of Northern Structure and Norteno members
> at [Fairlas Records] where something of this nature was planned.
> The individuals involved then went out and conducted that plan.  They went and
> looked for individuals that they wanted to assault, rob, and if it needed to be, killed . . . .

McCoy further testified that he learned about the meeting from his interviews with

Varela and the bartender, Leticia Torres-Morales, and that he knew nothing about what

happened at the meeting other than what he had heard from Varela and Torres-Morales.  The

defense did not object to this testimony.

On cross-examination by counsel for Cardenas and Varela, the prosecutor objected on

hearsay grounds to questions regarding what was said at the meeting, and the court sustained the

objections.  Varela's counsel then moved to strike McCoy's testimony about the meeting at

Fairlas Records, citing the Confrontation Clause and arguing that "we're being denied our right

to cross-examine the witness as to the full basis of that answer."  The court stated, "I'm going to

deny it.  It's untimely.  Had you objected at the time, I might have sustained the objection, as I

am doing now, but you did not."

On direct appeal, the appellate court agreed with Cardenas that: 1) the trial court

improperly refused to permit defense counsel to cross-examine McCoy about the factual basis

for his belief that a meeting had taken place where the plan to commit robbery and assault was

formed, and 2) the court should have granted the motion to strike McCoy's testimony on the subject.  The court ultimately determined, however, that the error was not prejudicial "because there was other strong evidence presented at trial—including testimony that McCoy properly offered as well as a great deal of additional evidence—that demonstrates beyond a reasonable doubt that the murder resulted from a plan by these three Norteno gang members, acting 'in association with the gang,' to rob and/or assault men who were lured from a Sureno-associated bar."

As discussed *infra*, however, the properly-admitted evidence supporting the gang enhancements was overwhelming even without considering Detective McCoy's improper testimony about the Fairlas Records meeting.  Varela therefore cannot demonstrate that she was prejudiced by the testimony, and she is not entitled to relief on the trial court's evidentiary error. Moreover, Varela cannot demonstrate a confrontation violation because the declarants, herself and Torres-Morales, appeared for cross-examination at trial.  *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements."). Varela is therefore not entitled to relief on the trial court's evidentiary error.

B.      Sufficiency of the Evidence Supporting the Gang Findings

Varela additionally argues that the jury's gang findings were unsupported by substantial evidence.  Varela asserts that the only evidence supporting the gang findings was Detective McCoy's improperly-admitted testimony about the Fairlas meeting.

To sustain a jury's gang enhancement finding, "there must have been evidence upon which a rational trier of fact could find that [the petitioner] acted with the 'specific intent to

promote, further, or assist in' *some* type of 'criminal conduct by gang members,' which may

include the crimes of conviction." *Emery v. Clark*, 643 F.3d 1210, 1216 (9th Cir. 2011) (per

curiam) (citation omitted).  The Ninth Circuit previously held in *Garcia v. Carey*, 395 F.3d 1099

(9th Cir. 2005), and *Briceno v. Scribner*, 555 F.3d 1069 (9th Cir. 2009), that the "gang

enhancement can only be applied when the defendant had the specific intent to facilitate gang

members' criminal activities *other than* the charged crime." *Emery*, 643 F.3d at 1215.  The

California Supreme Court explicitly disapproved of that interpretation in *People v. Albillar*, 244

P.3d 1062 (Cal. 2010), and the interpretation is no longer binding in this Circuit.  *See Emery*, 643

F.3d at 1215-16 (recognizing "that the California Supreme Court has overruled *Briceno* and

*Garcia's* interpretation of [California Penal Code] section 186.22(b)(1)" and applying "the

California Supreme Court's authoritative interpretation of section 186.22").  Thus, "[t]here is no

further requirement that the defendant act with the specific intent to promote, further, or assist a

*gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct

by *gang members*." *Albillar*, 244 P.3d at 1075-76 (citations omitted).

      In this case, much of the evidence that Varela's acts were gang-related and thus were

subject to the gang enhancement were provided by Detective McCoy, who testified that he

believed Varela was a Norteno gang member "based on his interview with her, the people she

hung with, and the type of activity in which she was involved."  Varela challenged McCoy's

testimony in part, as discussed *supra*, but the appellate court concluded that, even excluding the

challenged testimony, sufficient evidence supported the gang enhancement:

>      In the present case, the following admissible evidence—assuming for present
> purposes that Detective McCoy's challenged testimony was improperly admitted into
> evidence—was sufficient to prove that defendants' actions in committing this offense
> satisfied the elements of subdivision (b)(1) of section 186.22.  First, there was properly

admitted testimony by McCoy that the Nortenos are a criminal street gang that engages in criminal activities, primarily robbery, murder, assault, and auto theft, among other things. McCoy also testified that Surenos are a rival street gang to the Nortenos.

Second, there was a variety of evidence demonstrating that all three defendants were Norteno gang members. . . .  McCoy testified that Varela was a "Nortena," a female member of the Norteno gang, based on his interview of her, the people she spent time with, and the type of activity in which she was involved, which had included stealing cars and holding a gun for a male gang member, both of which are activities in which female gang members participate.  Young testified that Varela was a "home girl" who associated with Norteno members; whenever he saw her, she was in the presence of members of the gang.  Torres-Morales, the Mexico Lindo bartender, also testified that she knew that Varela was involved with northerner gang activity.  Cardenas testified that Varela was a Norteno gang member.  Finally, Varela herself testified that she and her boyfriend Gabriel Tafolla, hung out with members of VCF, which is a Norteno subset.

Third, although the allegedly inadmissible testimony might have supported a finding that the murder was committed "for the benefit of" or "at the direction of" the gang, there was a great deal of significantly stronger admissible evidence showing that the murder was committed "in association with" the gang.  As previously discussed, admissible evidence showed that the three defendants were Norteno gang members who acted together in the commission of this crime.  Furthermore, McCoy testified that robbery, assault, and murder are all primary criminal activities of Nortenos.  In addition, Varela testified that Trujillo told her to go into the Mexico Lindo Bar—which both McCoy and Torres-Morales testified was frequented by Surenos—to "pick up some guys that have money."  While Trujillo did not specifically mention robbery, Varela believed that was the plan.  Torres-Morales testified that Varela talked about setting up Rodriguez, Ponce, and Castillo Ramirez that night.  McCoy testified that all three men were Sureno gang "associates," with Ponce and Rodriguez involved in gang-related methamphetamine sales.  Torres-Morales testified that Rodriguez had said he was a gang member of a southerner clique, and Ponce was a "tag-along" with Rodriguez.

Young testified that, shortly before the shooting, Cardenas had said something to him on the phone about Varela "going with some guys" and "pulling some bullshit." Young further acknowledged at trial telling the police after his arrest that he had assumed there was going to be a robbery or assault.  The testimony of several witnesses, including Rodriguez, Ponce, and Varela, further showed that, at Trujillo's direction, Varela took the three men to a dark, isolated location in the apartment complex on Dana Drive, where Trujillo and Cardenas came up to them suddenly; Trujillo was holding a gun and Cardenas had, according to Varela, something "black and long"—presumably the pry bar—in his hands.  Rodriguez also testified that, after he was knocked out and then began to regain his senses, he felt someone patting him down or going through his pockets. Finally, after the shooting, both Varela and Young testified that they heard Trujillo say that he "got that fool," referring to his shooting of Castillo Ramirez.  Young believed Trujillo was boasting about the shooting when he said that.

Moreover, this same substantial evidence supports the finding that each defendant specifically intended to assist fellow gang members in committing the planned assault and/or robbery.

In sum, admissible evidence showed that the three defendants, all Norteno gang members, acted together in targeting patrons of a Sureno bar who had Sureno ties for robbery and/or assault, with a murder resulting.  The evidence also showed that robbery, assault, and murder are all primary criminal activities of Nortenos.  [T]his evidence plainly was sufficient to support the findings that the crime was committed "in association with any criminal street gang, with the specific intent to . . . assist in any criminal conduct by gang members."

The Court agrees with the state court's determination that there was sufficient admissible evidence to prove the elements required for finding a criminal street gang enhancement.  In viewing the evidence in the light most favorable to the prosecution, a jury could reasonably infer that Varela committed the charged offenses beyond a reasonable doubt "in association with" the Norteno gang and that she did so "with the specific intent to promote, further, or assist in any criminal conduct by gang members" pursuant to Penal Code § 186.22(b)(1). *See also People v. Romero*, 43 Cal. Rptr. 3d 862, 865 (Cal. Ct. App. 2006) (explaining that § 186.22 enhancements may be proven with expert testimony about criminal street gangs).  Varela's contention that the prosecution failed to establish the requisite specific intent is also without merit.  *See Emery*, 643 F.3d at 1215 (sufficient evidence existed to satisfy specific intent component of gang enhancement where defendant assisted fellow gang member in committing underlying crime); *Bonilla v. Adams*, 423 F. App'x 738, 739-40 (9th Cir. 2011) (testimony that defendant committed a robbery with two other gang members and expert testimony that explained in hypothetical terms how such offenses could be useful to the gang as a whole was sufficient to establish specific intent element of gang enhancement).  Accordingly, because Varela fails to establish by clear and convincing evidence that the state court's factual findings were erroneous and the record does not compel the conclusion that no rational trier of fact could have found

proof that the shooting was committed with the intent to benefit a street gang, she cannot prevail on this legal insufficiency claim.

8.    *Cumulative Error* (claim 8)

Varela finally claims that the cumulative effect of the errors she asserts deprived her of due process and a fair trial.

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence  in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

As discussed above, Varela does not allege any claims that amount to errors of constitutional dimension.  Accordingly, she demonstrates no errors that can accumulate to a level of a constitutional violation, and the state courts therefore did not unreasonably deny her relief on this claim. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

## V. CONCLUSION AND ORDER

Varela is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 17, 2014.

       /s/James K. Singleton, Jr.       
     JAMES K. SINGLETON, JR.
     Senior United States District Judge